Good morning, your honors. My name is Catherine Kimball Windsor, and I represent the appellant in this matter, John S. Romero. I'd like to reserve five minutes for rebuttal. Sure, just keep an eye on your time, please. I will. We raised six claims in this case challenging Mr. Romero's convictions, and I thought I would focus, I'm happy to go wherever the court wants, of course, but I thought I'd focus on two main claims. The first one is, well, the two that I plan to focus on are the jury questions and the court's answers to them, and then the second issue is the statutory issues about plan assets under 18 U.S.C. section 669. So starting with that first issue about the jury issues, we have raised sufficiency claims about the sufficiency of the conspiracy and whether the government proved that there was an agreement with the family members, with John Jr., with Evelyn, and with Danae Romero. And whatever this court thinks about those sufficiency issues, it's clear that the jury was really grappling with the evidence and whether there was enough to convict Mr. Romero based on an agreement with his family members. And they sent out this series of five notes that illustrate what was, you know, some of their thought processes. I don't think we can read too much into them, but the first question was about, you know, and I'm slightly paraphrasing, but about the degree of criminal knowledge that's required for a conspiracy. And that presumably came from the fact that both Evelyn and John Jr. had testified that they had not known that what they were doing was illegal until later. And, counsel, on redirect, that there are some – the briefing in this case is skillful, but I don't know how to – I don't mean to be disparaging, but it really read as cherry-picked testimony to me. To save time, I'm going to use that term, and I don't mean to be derogatory, but on redirect, the prosecution came back and it seemed awfully darn clear to me that they knew and that they testified to that. So on the sufficiency side, given the Jackson standard, those arguments struck me as non-persuasive. Okay? So now you're wanting me to – Yeah, so I'm not arguing the sufficiency at this point, although I certainly – you know, our position is that the evidence was insufficient. But what I'm addressing is the fact that the jury was struggling with this evidence, and they sent these questions. And the question that I'd like to focus on is the question about can we find a conspiracy based on an agreement with any other person? Do we have to find that there was a conspiracy with the family members? And over objection, the district court instructed that they could find a conspiracy based on an agreement with any other person. It did not have to be the family members charged in the indictment. And the problem with that instruction was that the people that the jury had asked about, Steve Dale, Caleb Dale, and Glenn Michael, there were major issues with two of those, as well as other potential conspirators. Specifically, Steve Dale at some point became a cooperator. He was an informant. So during that period of time – But how do we know that? I'm sorry? How do we know that? Okay. Well, so it's not in the record until the post-trial motion. So I – There's an assertion in a post-trial motion. Yes. And the government has never responded to that. So all I know is what's in the post-trial motion. Which is an assertion that's unsupported by any evidence, right, or any indication that Dale didn't testify at trial, right? Dale did not testify. But the – I mean, the government knows whether he was a cooperator or not. It was your burden on a post-trial motion, and the motion was denied. And I think this was – I'm not trying to be difficult. I really have tried to trace this thread. Yeah. Lord knows my law clerk has tried to trace this thread to try to figure out. And I just see the assertion. So can you help me out with this? Well, so the defense asked for a Sears instruction and said that the jury should be instructed that you can't have a conspiracy with an informant. So that's one indication of it. But the question is whether it was legally possible for – That's an indication that the instruction was requested and it was denied, I think, because the judge didn't see any evidence to support it, right? The judge did not respond to that. Nobody – the government nor the judge – Tell me why the judge was wrong. Tell me. I'm going to really listen carefully because I don't see how you connect these dots. Because it was the government's burden to prove a conspiracy with somebody that the defendant could have legally conspired with. And legally, the defendant could not have conspired with Steve Dale during the time that he was – But what evidence was there that there was a conspiracy that only involved Mr. Romero, the elder, and Mr. Dale, Steve Dale? Okay. So there was – Steve Dale was probably the most suspicious of the potential co-conspirators. All of the money was in an account called Dale Construction. He was the third-party administrator and he was making a lot of money. The testimony was something – his son said that he thought he might have been making $25,000 a month. You're describing to me evidence that seems to me – and I'll get out of your way and let you answer my question – but it seems to me you're giving me evidence from which the jury could have concluded that he was part of the conspiracy. But my question is, what evidence is there that there's any conspiracy that only involves those two? Well, there was – I mean, in terms of – there was testimony – I mean, I don't think we have to – I have to show that the only possible verdict could have been Steve Dale. The question is that when there's a legally impossible verdict that the jury may have relied on, that that is – You think the legally impossible verdict is that there was a conspiracy involving Mr. Romero and Mr. Dale? Yes. And another legally impossible conspiracy would be a conspiracy involving Mr. Romero and Glenn Michael because he was involved – all of his involvement is outside the statute of limitations. The case was indicted in 2015. Glenn Michael was fired in 2008. He was secretly rehired, but that – all of that – his involvement would be time-barred. The jury would have needed to have been instructed on that. We don't know what the jury relied upon. They may have found a conspiracy with Steve Dale. They may have found a conspiracy with Glenn Michael. They may have – the government – But, counsel, if the only evidence – if the only evidence that Steve Dale was a government informant is being raised after the trial in a bare allegation, doesn't that – that feels a little too late. Why do we get to come forward – why do we come forward with unproven allegations on your part, on your client's part, that one of these guys might have been an informant when they've had a full and fair opportunity to tease all of this out in discovery and a trial before the jury? It's the government's burden to prove. It certainly was the government's burden at the trial, but you've now had a trial. So, you know, maybe you want to do this on habeas or something, but this feels like – this feels like at this point, once you've had the trial, you've had your opportunity to put all the evidence in that you wanted to, and nobody said a word about this. Did you come in afterwards and said, well, we think he might have been a government informant, and now it's the government's burden to prove that he's not. But this is all post-trial. Your Honor, the government has to show that there was somebody that legally Mr. Romero could conspire with. The government also at trial argued that – Right, but that would be – that would include – that would include John Jr. It would include Evelyn. It would include his daughter, Danae. It included a whole bunch of people from which the jury could have – could have decided. But what – but under this court's – Several of whom have been guilty. Yeah, so under this court's precedent, so under the Yates case, the Supreme Court Yates case, and also this Ninth Circuit's recent Yates case, when there are possible theories that the government could have relied on, and some are legally valid and some are legally invalid, and we don't know on which theory the jury went with, the law is very clear that the conviction has to be reversed if there's any legal impossibility. This feels – again, this feels like – this feels like a grounds for habeas. It doesn't feel like a grounds for direct appeal when you didn't present any of this at trial. But it's not our burden to prove the conspiracy at trial. It's the government has the burden of proof beyond a reasonable doubt. And I don't think that they would – But why isn't it your burden if you're going to assert that Dale is not a qualified co-conspirator? Why isn't it your burden to come forward in a timely fashion when you've got – when you can get it before the jury? I don't know what else the defense lawyer could have done. He objected when the jury – when the judge proposed – and the government proposed instructing the jury that they could find this invalid conspiracy. The defense lawyer very clearly said, we object to this. This is not the conspiracy that was charged in the indictment. This is a constructive amendment of the indictment. I can't imagine what else the defense could have done at that point to come forward. The defense had asked for a Sears instruction, which the government had said was – they could not do. We do not know how the jury found, in this case, what sort of conspiracy they found, who the conspiracy was with. But we do know that many of the likely – at least two, really three or four if you throw in – the government argued they could find a conspiracy based on Robert Lagunas. That was time-barred. And we just don't know on what basis the jury found. And just the convictions have to be reversed on that because the verdict could have been based on a legal impossibility. And that filters down to the substantive charges because the jury was given three different theories. They were given two aiding and abetting theories, and they were given Pinkerton. And we don't know on what theory they relied. But if they relied on Pinkerton based on one of these conspiracies with somebody who legally could not be a conspirator, those substantive convictions as well need to be reversed. This argument about the Pinkerton conspiracy, did we see that prior to the reply brief? Yes. That was the – it was absolutely in the opening brief that the substantive convictions need to be reversed because the government argued Pinkerton. That was – in my opinion, reading the closing, that was really their main argument. They did also argue substantive liability based on these aiding and abetting theories too. And that's in your blue brief? Yes. Do you have the page for that? I don't want to take your time. I'll get that to you. I don't want to take your time. Absolutely. And I just wanted – I wanted also to turn, if it's okay, to turn to the second issue about how to determine plan assets under Section 669. And at the heart of this issue is this creative program that was started under the predecessor union where bands of mom-and-pop shops were brought into the union-sponsored health plan. And it was a benefit really for everyone because the union membership had gotten quite small at that point. And this stabilized the union plan. The people who joined agreed to this – to get this insurance at a good price. They paid a modest extra fee. I think we understand all of that. Yes. And so your argument is? Yes. So the government witnesses wrongly testified that these were plan assets under ERISA and therefore under 669. That was a framework that the government set up, that ERISA was how to determine if these are plan assets. They brought in an expert. And then they had two other Department of Labor employees who all said these are plan assets. And when you look at this court's law under Depot Inc. v. Caring for Montanans, plan assets are to be determined by ordinary notions of property rights under non-ERISA law. And the law says you look to the terms of the legal document that formed the trust and you look to the actions of the parties. And here it's quite clear that everybody thought that these extra fees went to the union. It was a perk of this program that the union – it was like a little way for the union to make some extra money. And these fees were disclosed, unlike actually in Caring for Montanans. The fees were disclosed. Everybody got the product that they wanted at the price they'd agreed to, which everybody says was a good product and a good price. And they knew they were paying these extra fees. And these extra fees were never intended to be health care fund fees. They were intended to go to the union and to pay for these extras. In this case, they paid for John Jay, who did some work for the health trust fund but also for the union, signing people up and assisting with disagreements they had. But these were union funds. They were never intended to be health trust funds, funds of the health care program. Did we view this for plain error? No. This issue was also preserved in post-trial motions, but it's also just a sufficiency issue. Did they prove that the funds were assets of a health care program? There was testimony, I have it on 1076, asking, would you consider that fee to be part of the health plan? And the response from the government's witness was, I would consider that to be a plan asset. This is one of the examples that you've raised in your briefing. And I don't see that for any of these examples there was objection to this testimony. So I'm not trying to be tricky. That's the reason for my question about do we review this for plain error. Right. I mean, the defense made a Rule 29 motion and said the evidence was insufficient. And honestly, I just think this expert testimony was incorrect and the jury was not given a proper framework for it. Those claims, they weren't raised in that form. But in the new trial motion, this particular case was cited and a Rule 29 motion was made preserving any sufficiency issue. I'm just trying to figure out what your argument is on this. I understand that you object to this testimony. That part I understand. But is it an evidentiary ruling? Are you saying that the court erred in denying a post-trial motion or exactly what is the legal premise for your argument here? I just need the framework. Yes. Okay, so I raised it actually in three different ways. So it's first a sufficiency argument. It's second that it's a challenge to the expert testimony, which invaded the province of the jury. And for that, that would be plain error? There's no objection at all? That was not objected to. That's correct. Okay. And then the third way that I raised it was that it was instructional error because the jury should have been given a framework about how to determine whether these were planned assets. And if it is plain error, that really goes to the heart of the case. This was the defense. Hold on. So the third is instructional error, and so my question is did your clients request an instruction that he was denied? No. So that also would be plain error. But that really was his defense, that he had never intended these to be planned assets. Really, nobody intended these to be planned assets. When the government prosecuted him the first time, they claimed they were union assets. It was only six years later when they filed a new indictment. This time they alleged that they were assets of the health trust fund. Are there more questions? I'll reserve the rest of the time. Thank you very much. Good morning, Your Honors. May it please the Court. Aaron Frumkin on behalf of the United States. I would like to just address in sequence the two sort of core issues that counsel just raised, unless the Court would prefer I have one. No, that's fine. So first, to address I think really what is the core of the jury notes issue is this legal impossibility argument with respect to Steve Dale. I think that the most fundamental fact for this Court's review is that there was no evidence presented before the jury, and there's no evidence in this record about Steve Dale serving as a government informant. Right. I've looked for it. My clerks look for it. We can't find it either. But opposing counsel's position, Dale didn't testify, so her argument isn't that he was on the witness stand and this wasn't disclosed. He didn't testify. And so what is your response to her position, which is that you all had the obligation to rule, I guess, to allow the possibility that there was an invalid conspiracy? Well, Your Honor, I think the response is that there was no legal impossibility anywhere in any of these conspiracy groupings that the jury might have chosen from. Steve Dale was a potential co-conspirator, just as Glenn Michael was. There was no evidence before the jury to support a serious instruction. I think the district court very reasonably decided, well, this would be awfully confusing because nobody's heard anything about this. When you say nobody's heard anything about this, they certainly heard involvement from Mr. Dale, and they knew they weren't seeing him at trial, and they knew he'd been involved in a lot of the— they certainly could have found that he was a member of this conspiracy, right? Oh, certainly, Your Honor. I'm sorry. I meant nobody's heard anything about the nature of his government informant capacity. Right. And as to that point, I understand counsel's argument to sort of be, well, defense couldn't have put evidence on about that, and it was our burden to do so. I'm not sure exactly what that argument is, but I can say that multiple agents involved in this investigation testified at this trial. Caleb Dale testified at this trial. He was Steve Dale's son. There was plenty of opportunity to elicit testimony about whether or not Steve Dale was serving as a government informant, and I can instruct the court in case the court is curious. As far as I am aware, it is correct that Steve Dale recorded one conversation at an agent's request, which was in— It's in our record. —2013. It's not in the record. Well, it's not in the record. But that's all to show any sort of legal impossibility here was far afield from the evidence before the jury, and there was no impossibility anyway because the jury had ample evidence to conclude that any of these other people, as alleged in the indictment, may have conspired with this defendant to further the objective of this one overarching agreement. And I think that's important to emphasize too because there's been a lot of counsel's arguments that maybe there were really many conspiracies happening here. All of the evidence in this case went to present that there was a group of people, maybe bigger, maybe smaller, but it was led by this defendant, John Sr., how he was referred to at trial, to take money from this health plan and to use it to further these Romero family purposes. They spent it on criminal defense attorneys, a personal civil judgment. The jury heard evidence that money was taken and used to pay the mistress of this defendant. So the jury had plenty before it to conclude that there was an overarching scheme here to take money from this one pot, and none of the other people who counsel has raised were legal impossibilities to participate in that. Glenn Michael, for example, he was fired in 2008. The jury heard that he continued to serve as a third-party administrator. The defendant may not have known that, but he was certainly involved during the relevant period and in any event under the precedent of Wilbur for a continuing conspiracy, as long as part of the overt acts occurred within the statute, a conspiracy can reach back to capture prior activity. I think your points are well taken. Is there any evidence from which the jury could have decided that there was any separate conspiracy that only involved Mr. Romero and Mr. Stevedale? I'm aware of none, Your Honor. I think it's possible that defense counsel at trial was trying to persuade the jury that, look, the bad guy here is not Mr. Romero. The bad guy is this person, Stevedale, or perhaps these other people. Right. So is there any evidence? Forgive me for interrupting, but is there any evidence from which the jury could have decided there was a conspiracy that didn't involve Mr. Romero, perhaps both of the Dales, for example? Could you stitch that together from this record? I honestly could not, Your Honor. I think that all of the evidence in this case went to show that everything that happened here was at the direction of this defendant. Either he set these sort of wheels in motion by asking various family members or third-party administrators to make certain payments, oftentimes recurring payments, or he just literally demanded that certain checks be written, as the jury, in fact, heard. Well, there is evidence in the record that at some point Evelyn Brott sued, accusing one of them of stealing, a third-party administrator, I think, from stealing from the trust, right? Could the jury have decided, oh, that's what really was going on? In closing, I think your argument was there's $800,000 missing, but it's not just $800,000 missing. There's money went to, and the jury heard evidence of the transaction to pay off the Mustang and some of the other transactions that you've just mentioned that benefited the Romero family. But is there any evidence that there were other transactions that could have involved a separate conspiracy just with the third-party administrator, that Evelyn accused of stealing from the trust or the Dales? None, Your Honor. The jury didn't hear any of the details about what money the Dales allegedly took. I think every witness who testified in this case about the movement of money, I think it's fair to characterize that they all were testifying as to one of those sort of five categories of improper payments that we focused all of our evidence on. There was no affirmative case from the defendants, so there was no other evidence that I am aware of. What about the planned assets argument? What about this expert testimony? So first, I think it's correct, as Your Honor was focusing, to remember the standards of review for each of these arguments. So I think it's true that counsel has creatively raised this sort of in three ways. One of them is as a sufficiency challenge, so that's the same sufficiency standard that Your Honor invoked. The Jackson standard. Correct. And then the others are unobjected to testimony or jury instruction, both of which would fall under a plain error standard. I think it's correct that that was not sufficiently acknowledged in the briefing in this case, which is problematic, but even putting that aside. Sorry, what wasn't sufficiently acknowledged in the briefing? The plain error standard of review. I mean, we pointed out in our brief that that's what applies here. You mean opposing counsel's brief you think didn't acknowledge there's a plain error. Correct, Your Honor, and there is authority where there's no attempt even made to show that you're meeting that standard, that that's not good enough. But even putting that aside, I think more importantly, very clearly with respect to the testimony, there was no improper testimony as to an ultimate issue of law. That's the only potential problem that we're looking for in this space, and what both Prunty and Barron, the expert, testified about here was what kinds of monies typically in a union-sponsored health benefit plan are permissibly used for plan purposes and what kinds of monies are not. And that made sense for the jury to hear that testimony, to understand the sort of backdrop of ERISA, which does undisputedly govern in civil context the type of health plan at issue here. Because this is a specialized field, and the jury would have no idea, as defendant did, and in fact he was very knowledgeable in this space, having done this once before, that when you set up a health plan that corresponds to a union, there are certain types of payments that are made to support the health plan. You may take on even extra money that goes above and beyond what's paying out the insurance companies, but the jury heard that that money is held in reserve in case there's some sort of catastrophic loss or in case there's something else that the plan needs to cover. And so I think that clearly the testimony here was proper. It was not as to an impermissible ultimate. Her argument is, forgive me for interrupting, but just so you can get to it, her argument is that there was testimony, and there is, that one of the experts would consider these funds to be plan assets, right? And that's an element of the offense. So your characterizing is not the ultimate issue because he didn't say that this individual, Mr. Romero, conspired to embezzle plan assets. I'll give you that. But what is your response to her point here? In addition to raising the standard of review, but what's your response? Sure, Your Honor. It's not an element of the offense. He has to steal from a health benefit plan, right? Correct, correct. But this, I think, is very skillfully sort of imported into the statute in the briefing. But what our burden to show here, to sustain a substantive 669 conviction, was that defendant stole, I don't think there's any argument about that prong, from monies of... There is argument about that prong, but not for purposes of this hypothetical. So go ahead. That defendant took monies of a health care benefit program. And that term is defined in Section 669. It's explicitly cross-referencing another provision, Section, I think, 24B. And that defines very broadly what a health care benefit program means under the law. This term, plan assets, that defense counsel is citing to in this Civil Depot case, is completely an opposite. It's dealing with civil ERISA law, which is not reincorporated in the statute. The statute makes no reference to it. In fact, there's a lot of problems even within the definition put forth in that civil standard. But I think it's important to take a step back and remember that the jury was instructed here that to convict on Section 669, they needed to determine that the money was of a health benefit program, and the definition was provided.  It's clearly explained in the statute. I think we're sort of chasing our tails a little bit with this other standard, but it's not relevant here. It's true that these witnesses testified about ERISA. And so at that point, I understand there's an argument, well, why were they even talking about it? But the response is nobody ever said, you must prove this civil standard in order to meet this statute. These witnesses were not testifying that plan assets is coextensive. They didn't even invoke that term. They used those words, I think, colloquially because they have a more general meaning, and counsel has very ably found... It is the government's case, and the government did put on this testimony. Sure, and, Your Honor, I think it was relevant and probative for the jury because they needed to understand the background principles of this pretty specialized type of union-sponsored plan. In the same way that the government put on evidence about how union elections normally function. It was helpful for the jury to understand this defendant's knowledge and intent that he manipulated these systems that he was expert in and that there are certain types of things that normally one may do with a union-sponsored health plan, and cutting checks to your mistress or paying for a Mustang or not, some of them. That was the impact of that testimony. That was the purpose. I'd also just briefly like to note that the point about extra fees, these CEA members paying extra fees, defendant's entire argument hinges on an incorrect factual assumption, which is that only those extra fees were stolen. That's just not true. The jury heard that all this money ended up in one pool. That pool included money from union members and from non-union members. The jury even more specifically heard that for those CEA mom-and-pop type people, the non-union members, the money that defendant took was the money that was being used to pay their health insurance premiums. It wasn't whatever was peeled off as any sort of... This part of your brief did seem a little bit confused to me because I think the evidence was that there wasn't an attempt to segregate in the way that you just said. Was there any evidence indicating that the gross amount collected from the non-union members for fees? No, Your Honor. I don't think there was any evidence as to the relative contribution amounts. No, no, no. I'm not talking about relative contribution amounts. The jury definitely heard that there was about $800,000. They heard that number, and then they have the testimony clearly that, as you just indicated, that the union, non-union weren't segregated and that the fees weren't segregated. I'm trying to figure out whether the jury had a total, even a rough estimate of a total, of the non-union members' contributions for fees so they could have compared that to the overall loss amount. No, Your Honor, and there's a good reason for that. These fees were never provided. They were never stipulated or earmarked. I mean, there were words in this pseudo-contract that these Mom and Pop members signed that said, and some extra fees, but there was no amount. It was never separately paid. It was just one lump sum. And it all went into the same place. That place was used to pay for these health benefits, and that was the same place from which defendants stole. I'm distracted by your comment about pseudo-contract. Is there something that I'm missing? No, I'm sorry, Your Honor. I'm just referring to the agreement, this sort of joiner agreement that these Mom and Pop shoppers... Why are you referring to it as a pseudo-contract? Is that just a flourish? It was probably a horrible choice of words, Your Honor. Okay, as long as you're not trying to call my attention to something. No, I only meant to say the agreement that these folks entered into in order to participate into this plan. Okay. Unless there are any further questions, I think I will submit. It looks like we don't have any. Thank you. Thank you very much. Thank you. I just wanted to start by directing the court to where in the blue brief I discussed Pinkerton. I've got it. Yeah, so it's 13, 31. These are pages 13, 31, 32, 35, and 47. I've got it. It's part of the summary of the argument as well. In terms of this idea that the government didn't have to prove that the funds belonged to a health care benefit program, that they only just had to prove that this union fund was a health care benefit program, it's part of the statutory language. That word of means they have to show that it belonged to the health care benefit program. I mean, that's why they put on this expert testimony saying that these were plan assets. That was really the big question because the defense in this case was that they didn't belong to the health care benefit program. And this ERISA framework was the one that the government set up to do that. And the problem is that the testimony was incorrect about what the law was under ERISA. But the standard you cited a minute ago is the one you would want us to rely upon about ordinary principles to determine ownership. Exactly. That comes from that Caring for Montana's case. In terms of the government's claim that the premiums were stolen, all of the premiums were paid. There was no evidence that anybody lost health insurance. At all points, all of the premiums were paid. And the testimony was from the third-party administrators that when they would receive one lump check, they had these receiving accounts and they would separate the fees. So they took for themselves, I think it was something like $8 per employee. They separated. There was an account for the reserves. There was an account for these co-administration, co-agency fees. There was an exhibit that broke them down. They were absolutely segregated. So really the question is, what was the nature of those fees? It's true that the government expert didn't trace them because the government expert's position was, and also the financial analyst's position was that it didn't matter, that there was no significance to those. But I definitely think this case is different from any other case under the statute where actually people's premiums were stolen. That did not happen here. I see that I'm out of time, unless there's anything else. You can wrap up. The only other thing I wanted to mention was that I'm really troubled by the government's argument that there's no problem with legal impossibility. And I want to direct the Court's attention to that Fuchs case, which is cited in the briefs. And that was a situation where there were acts that happened outside of the statute of limitations and acts that happened within the statute of limitations. It was similarly kind of a long conspiracy. And the Court said that it was plain error in that case not to instruct the jury about the statute of limitations. And so just to say that because the jury didn't know about the statute of limitations that it doesn't matter, it does matter. I mean, it's their burden. And similarly, it's their burden to prove that Mr. Romero conspired with a person that he, under the law, could have conspired with, to say that there was nothing in the record about it. I mean, there's nothing in the record about it because they didn't respond to it, because they said that, oh, the Sears instruction doesn't matter. But it mattered very much. I mean, this isn't a game about what the jury knew. These facts were not told to the jury because the government did not present them. Over your time, I want to thank you for your argument. Thank you all for your argument and careful preparation. We'll take that matter under advisement and we'll stand in recess for the day. All rise. This Court for this session stands adjourned.
judges: BYBEE, CHRISTEN, Fitzwater